May I please the Court? My name is Sara Nazbohar. I'm counsel for the appellant Mr. Abdullah Fraihat. I'd like to reserve about three minutes for rebuttal. There are basically two issues presented in this appeal, and the first is whether the BIA abused its discretion when it denied Mr. Fraihat's motion to reopen on the ground that it was untimely filed. We believe that Mr. Fraihat was entitled to equitable tolling, and that is based on the fact that the immigration judge gave him wrong advice. And basically what the immigration judge did was three times he told Mr. Fraihat, even if you were to succeed in your petition for seeking deferral of removal under the Convention Against Torture, that you would have to spend the rest of your life at the corrections facility in San Diego. He might have to. Pardon me? He might have to spend the rest of his life. No, I think he said it three times, and I think one time was you will. The other two times was you may. And I can point you to the ---- Well, he had this particular gentleman had previously had been subjected to withholding, so he was he knew what that was all about. To withholding, well, he had gone through the procedure once before, correct? And he had been actually given ---- it had been found at that point in time that it would be dangerous for him to return to Jordan. But he was not required to stay in this facility. He was able to go out and do his ---- into the community and continue his activity. No, but at that point in time, he was ---- the I.J. in that case found that he was entitled to relief because the I.J. found that it was going to be dangerous for a Muslim convert to Christianity. Right. To return to Jordan. So I don't believe that he had any ---- that first experience would have informed him and would have given enough reason for him to doubt what the I.J. was now telling him in very clear terms three times. And I believe one of the statements was you will spend the rest of your time, the rest of your life at CCA. And we all know the conditions at CCA. And so ---- No, well, I don't know necessarily the conditions at CCA, but ---- There has been ---- I mean, I don't know if you're able to take judicial notice of that. I put it in my brief. There has been significant litigation about the inhumane conditions at CCA, and it's been the subject of much press report. But, you know, I'm just thinking as a trial judge, when I advise someone of their rights before I take a plea, I tell them the worst possible scenario. I say, now, this could happen. You understand that if you plead guilty, you may have to spend 20 years in jail. That's the maximum. And I have to tell them what the maximum is. Well, allow me to first start with exactly what one of the statements made by the IJ, and that's found in the record AR-505. And the IJ says, with the understanding that if you win, you're going to sit in CCA for the rest of your life. Now, that is a statement that is completely contrary to the U.S. Supreme Court holding in Zadridis. I may be pronouncing that incorrectly. Because of the small exception. Because of the holding that when an alien cannot be removed to their home country, the Constitution does not allow us to keep that person indefinitely in custody. And, in effect, that was what the IJ was telling me. Unless. They're a threat to. But, you know, you're asking a lay person who is hearing this from an IJ who has been living in CCA and not enjoying it. Yeah. And is being told. And if I may, what I find very significant are two statements by Mr. Freyhut. So, the IJ says, even if you win, you understand you're going to have to sit in CCA for the rest of your life. There are two comments by Mr. Freyhut, which I find very insightful. He, in his immediate response, says, yeah, why don't I go get killed, Your Honor? Which, to me, means, why don't I just go back to Jordan and die? Because, to me, he's equating the possibility of death in Jordan, which is what he truly fears, with remaining in CCA for the rest of his life. And that's also on page 505. And at another point, when the IJ tells him you're going to have to stay here forever, he says, I don't want to fight my case no more, Your Honor. I mean, clearly the impact for him. Go ahead. The impact was what? That he will have to remain in CCA. He equated that with, why don't I just go back to Jordan and die then? Because that's how bad life for him has been at CCA. And, again, I would ask the Court to take note of CCA has been the subject of much litigation. I believe the ACLU sued, and they ultimately reached a settlement. And so your argument is that this wrong advice caused what to happen? Caused him to waive his right to appeal. And it wasn't because he thought, I really don't want to stay here even if I win. So he ultimately waived his right to appeal. He later rethought that and thought, no, I am going to fight and I'm going to try to stay here. But it wasn't for some time after that he came to realize that what was said to him by the IJ was incorrect. When was the date? What was the date that that statement was made? Based on the record before, Your Honors, I cannot pinpoint the date. But what I can say with certainty is that by the time he filed his brief with the BIA on, let's see, on May 5 of 2006, in that brief he sets forth the various comments made to him by the IJ to the effect of, you're going to have to stay here for the rest of your life in CCA. Now, I will also offer to you, having pored over this file, I think the moment of realization came to him when he was appointed counsel for his hapeus. And that counsel, I think, must have told him what you were told by the IJ is incorrect. Because that was part of the hapeus petition. He is currently out of custody. He has been out of custody for about two years. What do we do with his behavior between March 22nd and January 25th? He filed a notice of appeal, a motion to reconsider, a motion to reopen with the BIA, two petitions for judicial review. It doesn't seem like he was terrorized from doing all of that. Well, he apparently, after having waived his appeal, then he decides, you know, I'm going to fight this, and then gets caught in this quagmire of trying to have his issue heard. And he didn't take the right paths, and it's not too surprising for a pro se litigant. But he knocked on every door he could possibly knock to have his issue heard, and at every corner he was barred because he had waived his appeal. So, you know, he would go to the BIA. BIA would say, I'm sorry, you've waived your appeal. Then he went back to the immigration judge and asked to reopen. So, I mean, he basically knocked on a lot of doors, so you can't say he wasn't diligent. But here's a pro se litigant trying his best to work his way through this quagmire, and, you know, it is a very lengthy case with a very complicated procedural history. You put a lot of emphasis on the fact that he was a pro se litigant. Correct. But he's a gentleman that has been familiar with the legal system in the United States for a long, long time, starting back in 1994 when this first felony conviction, then 1997, another conviction, and then, you know, then the stay in 1999, the withdrawal was granted. Right. And then he's out, and then another felony conviction. I bet you he knows more about the legal system in the United States than he ever would in Jordan, because he's been, almost since the time he came to the country, been involved in one facet or another of our legal system. Yes. Your Honor, certainly your representation is correct that he has had involvements with the legal system. I would not agree, however, that that somehow makes him an expert on the legal system. I, as an attorney, have had it very hard to go and to find my way through the various procedural procedures of immigration law. So I – and I have supposedly the training to be able to do this. So, you know, I don't think having been in trouble with the law makes him necessarily understand some of these issues very well. But so our primary claim in this appeal is we believe that there was an equitable tolling, because he definitely missed that 90-day period for seeking to reopen the I.J.'s opinion, but that was because he didn't come to realize until some time later that the information given to him by the I.J. was not correct and, in fact, contrary to the Supreme Court. And exactly what are you asking us to do? I'm asking, Your Honors, to send the case – remand the case to the BIA and then to the extent necessary to the I.J. to have the merits of his claim heard that he – or reheard that he has – he is entitled to deferral of removal under CAT. And to allow – this time he will have an attorney and to allow him to submit additional evidence regarding conditions in Jordan for Muslim converts. A long time has transpired since he last was able to submit any evidence, and at that time he was pro se. And so – and also my other request in the remand is to have some deference given or some acknowledgement given to the first I.J.'s finding that there was danger in Jordan to – for a person who has converted from Islam. I mean, you're basically having the same consideration being remade. And I – there's got to be some consideration of, well, an I.J. in the past found that there was danger. Now, have – has situations improved – has the situation improved in Jordan? I don't believe so, but that's subject to an evidentiary finding. You know, he was in danger before, and I believe he's in danger today. Thank you, Counsel. We'll give you an opportunity to respond. Thank you, Your Honor. May it please the Court, I am Don G. Sproggin on behalf of the United States Attorney General in this case. This case does have a complex history, but there is a simple and single issue before the Court for disposition. And that is whether the Board abused its discretion and therefore reasonably exercised its very broad discretion in denying the admittedly untimely motion to reopen filed by Petitioner which sought to revisit a matter already disposed of by the Board and by this case at a previous time. It is uncontested that the motion to reopen was untimely. That's not before the Court. It is also uncontested, as the record shows, that Petitioner made no arguments regarding changed country conditions or any other regulatory exception that might excuse his motion's uncontested untimeliness. That should be the end of the case. Petitioner has had many bites of the apple in this case, and I think it's important to emphasize that the government has made sure that his case was fully and fairly heard. It was the government that initiated remand from the third petition in this Court's 2007 decision. The 2007 decision of this Court disposed of three petitions for review. Two of them were denied, and one was remanded pursuant to the government's initiative in order to make sure that the Board could look once again at the merits of his arguments. Petitioner never made the arguments you've heard this morning. They appear nowhere in the record. They are the creation post hoc of the brief and Petitioner before this Court. The issue of equitable tolling was never raised. It was never exhausted before the Board, and therefore the Court lacks jurisdiction even to consider the argument of equitable tolling. There's simply nothing in the record to support any raising of the issue of equitable tolling. The prejudice that the Supreme Court has reflected in numerous decisions regarding why motions to reopen are disfavored is reflected, I think, fairly in this case. Judge Weisslein, you're a district court judge, and I'm sure you know much more than I do about new trials because of newly discovered evidence. The Supreme Court has said in the Doherty case, D-O-H-E-R-T-Y, that the reason that motions to reopen in immigration cases are disfavored is because for the same reason as our petitions for rehearing or a motion for a new trial on the basis of newly discovered evidence, there's a strong public interest and a strong judicial interest that eventually a case be over. Here, there is no argument that there's any new evidence. There is simply a new argument, a new argument that Petitioner's counsel says he wishes he might have made years earlier in proceedings before this Court or before the Board. The equitable tolling issue is not before the Board. The Board did not address it, and the Board did not need to address it. Moreover, this Court's precedents say that it may review only those grounds on which the Board relied, and the Board denied this motion to reopen solely on the ground that it was untimely and that there was no argument raised regarding any excuse of its admitted untimeliness. Petitioner must exhaust his issues, and he hasn't done so. I think it is unfair for Petitioner to imply that somehow because there were facts in the case and Petitioner might have or wishes that he could have raised this argument at some prior time means that it is now before the Court. I think that is simply not the law. Petitioner relies in his brief on Socop Gonzalez, the case before this Court, which is clearly distinguishable. Socop said that Petitioner need not use magic words, equitable tolling, in order to invoke equitable tolling. He happened to call it equitable estoppel, which was incorrect. But he made out the claim. He said he had been given wrong advice. He had relied on that advice, and he exercised due diligence. Your Honors have asked a question about when Petitioner decided that his waiver of his appeal was not known and involuntary. The record answers that clearly. You should look, I would suggest, not to the briefing before this Court, but to the record that is before the Board and to the record that is now before this Court. Petitioner, in his motion to reopen, states, and I quote, I came to the realization, unquote, that his waiver was not voluntary in knowing. On May 18, 2005, that was before the Board's denial of his appeal, of the immigration judge's denial, and it was, he then filed, he therefore states that on May 18, 2008, and this is located in the record if you wish to look at page 281, he came to the realization that his waiver was not voluntary. He then filed a motion to reopen 198 days after the Board's decision and 252 days after he came to the realization. There's no question that's not due diligence, even if the equitable tolling issue were before the Court. Returning to the Socop-Gonzalez case, the Court simply said that Socop never specifically invoked the phrase equitable tolling, but he did make out the claim. That's simply not the issue here. I think it is important for the government to state that there has been a concerted effort on the part of the government in this case. This is not an attractive alien to the government. He has a long criminal history, 14 years of his 20 years in the United States, and has been in detention for his commission of felonies, aggravated felonies, particularly serious crimes, and yet the government has gone out of its way. It was the government's initiative to give this alien another bite at the apple by remanding the case back to the Board so that it might fully consider the arguments he wished to make. He has had 10 hearings before the immigration judge and the Board. The Board's decision, the Board itself reflected the government's interest in making sure that all issues were completely demolated because the Board's 2008 decision, which is before this Court for review, reflects that the Board itself reopened. It reexamined the merits of petitioners' arguments and denied them. This Court has said that eventually, at some point, this Court has said, litigation must come to an end and that there is a judicial interest and a public interest in finality. I'm happy to answer any further questions if you have any. On the exhaustion issue, I'm sure you've read it, counsel's response brief. She said, this is precisely what happened here. While Freyhut did not use the words equitable tolling in his May 5 brief to the BIA, he set forth the facts relating to the IJ's incorrect legal advice and thus made clear that he was entitled to equitable tolling. Is that true, that in the May 5 brief he set forth the facts of the incorrect legal advice? No, Your Honor, that is not correct. I think the record would reflect that he made no reference either to even stating that his motion was untimely. He certainly never made the next step of arguing why the untimeliness should be forgiven. It is simply nowhere mentioned. And the Board expressly states that in its decision, he doesn't even address the untimeliness of the motion. So he certainly never reaches the next step of arguing that the untimeliness of the motion should be forgiven. There is simply nothing there to support that. As for the immigration judge's advice, the detention issues are simply not before this Court in this case, but both the Board and this Court have reviewed the detention issues of Petitioner. They've been fully and fairly heard, even though they're not before the Court in this case. And the IJ's advice, even if it were a bit extreme, it was still correct. There's nothing incorrect in stating that a grant, as the immigration judge said, he said, that's where the government basically says we will not send you to Jordan, but there is a strong possibility, said the immigration judge, that you may have to stay at the detention facility. That's accurate information. Moreover, I think this reflects an immigration judge's taking seriously his job of making sure the record is complete. And with a pro se alien, an immigration judge has an obligation to inform a pro se alien of the relief for which he might be available to him. Here, deferral of removal under cap. And he did so and he also made sure that he understood that granting deferral would not mean that he would be released from whatever detention decision was reached. And that's simply the beginning and the end of that issue, I would suggest. And you're asking us to do what, counsel? Dismiss? I'm asking you to deny the petition for review because the issues raised are simply, insofar as the petitioner argues issues that are not exhausted, then the petition should be dismissed. And insofar as there is any issue before the Court over which there might be jurisdiction in the Court, it should be denied. Thank you, counsel. Thank you. I have much to say, but I'm going to start with the question you posed. Well, that's good because I was going to ask you precisely to read for us the words that you say amount under SOCOP to raising the issue. Okay. Very good. That's what I've got before me. Okay. The brief that was filed with the BIA in May. And where is this in the record? It starts on AR116. 116. The first page of the brief. My opponent is drawing on a sentence in that brief on page 123 where Mr. Fryhat says that he, on April 18th of 2005, came to the realization of his unknowing and unintelligent waiver. I believe, and I've argued in my brief, that has to do with his first waiver argument, which this Court has previously rejected, and that is he did not fully understand the meaning of waiver. But the argument we're making today is on page AR149. Where Mr. Fryhat writes in his brief. Counsel, do you have 149 before you? Please follow it while we're hearing this argument. Okay. The IJ said, and he's arguing his due process rights were violated, and in support of that argument he says, the IJ said that if Mr. Fryhat's win his relief from deportation, deferral, he is going to keep him in immigration detention, CCA, for the rest of his life. The BIA ruled on that. And the way the BIA characterized it was, you claimed that the judge didn't like you. We don't find any basis for that. And let me find the exact word. Those are the only words that you're talking about. That's the reference. There's no reference at all to ineffective representation or misadvice by the IJ or anything at all. It's just a factual statement. That's it. Correct. And when you look at Sokov, it says, and Sokov is very similar to our case, because that case, again, the petitioner was given incorrect advice by the IJ. And Sokov said, we're going to find equitable tolling, because he set forth the incorrect advice. And that petitioner had an attorney, whereas mine did not, which, again, I think puts us in a different ballpark. But Sokov is very much on point. They did find tolling there, even though the guy had an attorney, because he presented facts from which the board could understand that he would be entitled to tolling. And I would add also that the whole issue of whether your waiver of your right to appeal was improper, was a due process violation, means that you're not subject to the same exhaustion requirements. And when we cite it to cases in our brief, Polaris, Gollin, and Murrow, Inclan make very clear that exhaustion is not required for due process claims. Now, when Mr. Frehut filed his brief with the BIA, he was up front about the fact he had missed the 90-day deadline. Implicit to that is, I'm entitled to some sort of equitable relief from this deadline. And then he talks about the fact that he believes a due process violation had occurred because the judge had given him wrong information. So I believe that exhaustion, one, occurred, and, two, it is not required to occur when you have a violation of due process. And there are two other cases I'd like to bring to this Court's attention. Two cases prior to us have already held that when you have a waiver of a right to appeal, based on erroneous advice from the IJ, then you've got a due process violation. Again, Polaris, Gollin at 359 F. 3rd, 1088, and Leon, Paz, 340 F. 3rd, 1003. I'd like to quickly address some of the other arguments being made here. You know, initially, my opponent, again, did what he had done in his opposition brief, and that is to completely ignore the Supreme Court's holding in Zedrides. I think that we need to talk about that, and we need to talk about that in connection with the comments that were made here by the IJ. The other claim made by my opponent that we are asking you to revisit an issue that the Ninth Circuit has ruled on before, again, is incorrect. The Ninth Circuit before had ruled on my client's claim that his waiver was unknowing because he did not know that by waiving, he would be, in fact, giving up all his rights. That is a distinctly different argument than the one before this Court today, and that is I waived because I was told incorrectly by the IJ that I would have to spend the rest of my life in CCA. And my opponent, again, very selectively chooses one of the comments of the IJ when the IJ was a little bit more accommodating, saying you might have to be here for the rest of your life. As I started out our discussion here today, in one of his statements, he stated in very clear terms, you are going to spend the rest of your life in CCA. There was nothing maybe about that. Then my opponent talks about how there is no new evidence to warrant a reopening. Again, Socop versus Gonzalez is directly on point. That Court discusses the fact that when the petitioner realizes that the information, advice given to him by the IJ was incorrect, that constitutes new evidence. That is exactly our situation. Our new evidence justifying reopening is that we now know that the IJ gave incorrect advice and that Mr. Freyhut relied on it. But in Socop, it was so much more dramatic. I mean, the misadvice, you know, if you he ends up withdrawing his plea and as soon as he does that, I mean, basically he follows the advice he was given and it turns out that the application, that he becomes deportable immediately. Right. What makes it less dramatic in Socop, he is an attorney. And he's hearing this stuff from the IJ. He's got an attorney who should be advising him what would be the right thing for him to do. My client does not have an attorney, is being told he has to spend the rest of your life in this horrible place, even if you win. I mean, what is there? I mean, so he says might as well go back to Jordan and die. I mean, that's that I think is such a telling comment because it tells you how amazingly what the impact that comment had on him. But it was possible that that's that's what he was looking at. I mean, I can see the Ninth Circuit writing an opinion saying a failure to put it in stark terms is a mistake. I believe that, you know, the IJ should have said there is a possibility that you may have to spend the rest of your life here if you are found to be a danger to society. Well, wasn't it reasonably apparent from the record that he was a danger to society? What was his record? Well, Your Honor, I can tell you he was not a danger to society because the district court two years ago released him because of exactly the Supreme Court's decision. What was his record? What was his criminal record at the time? I can tell you in one second. His first conviction was for grand theft. The second conviction was for possession of a check with an intent to defraud. And the third conviction was for possession of meth, I believe. Those are all state convictions? These are all state convictions, I believe, yes. Are they three strikes and you're out convictions? I don't know. And I shouldn't say because I don't know. I don't know. But what I do know is that he had an extensive hearing before the district court two years ago, and they found that he was not a danger. And they have released him under supervision. He's been out for the past two years working. And I have to take issue with the ---- Counsel, I think it's time to sum up. We've allowed you to exceed your time. May I sum up or I'm done? Very briefly. Okay. I just want to say that the whole point of us being here is not necessarily whether our clients are attractive or not, but it's about what are the laws of this country and whether we have followed them truthfully in regard to the way we handle the people who go through our system. And so that is what I would like to close on. And on behalf of our court and our panel, we'd like to thank you. This case was included in our pro bono project. You've taken this on and you've given it everything you've had. You've done a fine job. Thank you. We appreciate it. Case just argued. His order is submitted.
judges: Beistline, Trott, Rymer